UNITED STATES, Appellee,

v.

James W. McKINNIE, Staff Sergeant,
U.S. Army, Appellant.

No. 63,979.

CM 8801151.

U.S. Court of Military Appeals.

Argued Nov. 27, 1990.

Decided March 20, 1991.

For Appellant: *Captain Deborah C. Olgin* (argued); *Colonel Robert B. Kirby* and *Captain Alan M. Boyd* (on brief).

For Appellee: *Captain Jonathan F. Potter* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Randy V. Cargill* (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

On May 18, 1988, appellant was tried at Fort Sam Houston, Texas, before a general court-martial with officer and enlisted members. Contrary to his pleas, they found him guilty of two specifications of violating a general regulation by fraternizing with several female trainees and of two specifications of false swearing by signing a false statement about the two instances of fraternization, in violation of Articles 92 and 134 of the Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively. He was sentenced to a bad-conduct discharge and confinement for 120 days. The convening authority approved these re-

sults, and the Court of Military Review affirmed. 29 MJ 825 (1989). We granted this issue for review:

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED BY HOLDING THAT THE MILITARY JUDGE'S ERROR IN FAILING TO GIVE REQUESTED ACCOMPLICE INSTRUCTIONS WAS NOT PREJUDICIAL TO APPELLANT.

I

Appellant, Gaither, and Gray were staff sergeants and instructors at the Academy of Health Sciences at Fort Sam Houston. An Academy regulation in existence there bars fraternization between instructors and student trainees. However, testifying as a government witness, Staff Sergeant Gray averred that on December 21, 1987, he, appellant, Staff Sergeant Gaither, and two female student trainees from the Academy, Specialist Phelps and Private LaRue, had a party at appellant's offpost apartment where they drank and played strip poker. He also testified that he had sexual intercourse there with Specialist Phelps. Two days later, he recalled that he, appellant, Specialist Phelps, and another female student at the Academy, Private Milashouskas, were also at appellant's apartment playing cards and drinking. He then testified that at that time appellant had sex with Specialist Phelps.

The three female students also testified for the Government and confirmed that they were at appellant's apartment drinking with him and the other instructor(s). Private LaRue testified that appellant was an instructor in her company. When she played strip poker at his apartment, she had won and was the only person left with some clothes on. The others—according to the witness—were all stripped down to their underwear. Furthermore, at the party, Staff Sergeant Gaither tried to make a move on her; and he was hugging and trying to kiss her.

After admitting that she was married and had four boys, Specialist Phelps testified that she also attended the party at appellant's apartment where they played strip poker. After they played strip poker, she went to shower; and appellant followed her there, fondled her breasts, caressed her vagina, and kissed her. She testified that she later had intercourse with Staff Sergeant Gray. Two days later, she went back to appellant's house, drank, and played a regular card game. At that time, she and Staff Sergeant Gray had a "terrible fight," because of rumors that Gray accused her of starting. She further recalled that she had sex with appellant then and finally had sex with him again at his apartment on December 29, 1987.

Private Milashouskas testified that she had been at appellant's house on December 23, along with Specialist Phelps and Staff Sergeant Gray. Appellant called her into his kitchen, tried to pull her toward him, and stated that he wanted her. When she resisted, he stopped. She also testified that, when Specialist Phelps and appellant went into his bedroom, Staff Sergeant Gray tried to "hit" on her; however, she resisted and eventually he agreed to take her back to the installation. Furthermore, she had seen Specialist Phelps naked in appellant's bedroom; and, as she and Staff Sergeant Gray were leaving, Gray indicated that Specialist Phelps and appellant were having sex.

On cross-examination, this witness testified that she was aware that Specialist Phelps had a relationship with Staff Sergeant Gray; and he was upset with Phelps because rumors had gotten out that they had engaged in intercourse. When she was at appellant's apartment, Specialist Phelps was also emotionally upset because Staff Sergeant Gray was furious with her on account of the rumors.

Appellant did not testify in his own behalf; but, at the close of the case on the merits, defense counsel requested an accomplice instruction as to these four government witnesses. The military judge gave one as to Staff Sergeant Gray; but he denied it as to the three students and stated that they were "victims" rather than "accomplices."

Appellant contended before the Court of Military Review that the military judge had erred in refusing to instruct the court members that the three students also were "accomplices" of appellant and that, accordingly, their testimony should be considered with great caution. The court below agreed with appellant that, since "both instructors and students who fraternize violate the regulation, the three students who testified against the appellant were accomplices and the court members should have been instructed to regard their testimony with great caution." 29 MJ at 828. However, the court determined that appellant had not been prejudiced by this error and found it unnecessary to overturn the court members' findings of guilty on the two fraternization specifications.

## II

The correctness of the Court of Military Review's decision is the issue raised by appellant on this appeal. We conclude that the decision was correct.

## A

■ The usual test applied in determining whether a witness is an accomplice is whether the witness himself could have been convicted of the same crime for which the defendant is being prosecuted. *See United States Scoles,* 14 USCMA 14, 19, 33 CMR 226, 231 (1963). Thus, if the three trainees could have been prosecuted for violating the same fraternization regulation under which appellant was being tried, they clearly were "accomplices."

Here, Academy of Health Sciences Regulation No. 600–8, under which appellant was charged, makes it unmistakably clear that "[t]his is a punitive regulation which prescribes standards of conduct required of *all* Academy of Health Sciences *personnel.*" (Emphasis added). The regulation categorically directs "all personnel" to "familiarize themselves with the" regulation and "comply" with it. Para. 1a. In addition, the regulation explicitly states that "[t]his regulation applies to *all* elements of the Academy of Health Sciences, ... as

defined below, on or off duty and on or off the military installation." Para. 2 (emphasis added). Defined thereafter in the regulation are "Permanent Party Personnel" (para. 3a) and "Student Personnel"; and the latter term includes student trainees (para. 3b). Since the regulation clearly makes all "student personnel" at the Academy of Health Sciences responsible for acts of fraternization, the three trainees involved in the fraternization with McKinnie were definitely his "accomplices," as the Court of Military Review held. 29 MJ at 828.

In refusing to give the accomplice instructions as to the three female trainees, the military judge viewed them as "victims," rather than as "accomplices." Undoubtedly, he perceived that the purpose of the regulation is to protect vulnerable student trainees from overbearing instructors.

However, the regulation serves other salutary purposes that are completely unrelated to a student trainee's being a "victim." For example, even if the instructor and student are quite willing to socialize, such activity seems to undermine respect for authority and discipline—both on the part of the persons involved in the relationship and of others who may be exposed to or know of the activity. An excellent example of this very point is the bitter altercation between Staff Sergeant Gray and Specialist Phelps which resulted from rumors at the Academy about the sexual relationship between the instructor and his student.

The fraternization regulation also protects instructors from unknowingly being lured into a situation with a student who wishes to "use" their relationship to his or her academic advantage. Indeed, the regulation itself states that it seeks "to insure that no favoritism is exhibited in the conduct of training or other military duties." Para. 1b. Clearly, a student favored by an instructor as a result of fraternization has been "benefited," rather than "victimized." Therefore, the fraternization regulation in this regard serves a purpose not related to the student's being a "victim."

## B

■ During oral argument in this case, appellate government counsel argued that—as suggested by the benchbook instructions—the reason for giving an accomplice instruction is the possibility that some type of deal has been made between the prosecution and the accomplice. Para. 7–10, DA Pam. 27–9, Military Judges' Benchbook at 7–15 (1982). On this premise, government counsel rationalize that an accomplice instruction was unnecessary here, because the record in this case makes clear that no deal had been struck with the female trainees—even though they were not prosecuted.[1]

Even if there were no formal "deal" in the instant case, it seems significant that the female trainees apparently were not receiving any punishment—or at least they were not being court-martialed for their participation in the violation of the military regulation at issue. Private LaRue testified that, even though she was not given immunity, "[t]hey promised that they would do everything they could for us." Specialist Phelps also testified that "I would not right at this moment be prosecuted or nothing at this moment would happen to me." Thus, even if the Government's basic premise were correct that an accomplice instruction is only given when a deal has been struck with the prosecution and the accomplice, in light of LaRue's and Phelps' testimony, the accomplice instruction should have been given here.

Furthermore, the reason for giving an accomplice instruction is not merely because of any bargain that has been made by the Government with an accomplice. In fact, the cautionary instruction also is given because it is recognized as a fact of human nature that, if two persons are involved in the same crime, each will frequently try to shift most of the blame to the other. Even if there is no "deal," this aspect of human nature would seem generally to apply and to warrant the instruction.

## C

■ Although the female trainees were accomplices of appellant and the military judge erred in refusing to give a cautionary instruction as to the manner in which the court members should view their testimony, we also agree with the Court of Military Review that appellant was not prejudiced by this error. 29 MJ at 828. In the first place, the instructional error did not involve an element of the offense or a defense. Instead, it only affected the evaluation of the credibility of certain witnesses. Second, as suggested by the Court of Military Review, the rationale behind requiring an accomplice instruction goes to reliability of the accomplice witness and, by giving detailed instructions for assessing the trainees' credibility, the military judge adequately brought the same concern to the attention of the court members. He specifically advised the members that the interests of a witness should be considered, as well as the relationships between the parties and how those relationships might affect their testimony.

The issue of the reliability of the trainees' testimony also was brought to the attention of the court members by the civilian defense counsel's skillful cross-examination of the witnesses. For example, he extracted from one of them the information that another trainee (Specialist Phelps) was "a wild story teller and she's not very trustworthy." He conducted a painstaking cross-examination of Phelps, which exposed numerous untruthful statements she had made to the authorities about the incidents in question; and he obtained her concession that she had lied in these earlier pretrial statements.

---

**1.** This argument actually smacks more like one of prejudice, *see* opinion, *infra*, than one of whether the instruction was necessary. To make clear, "Instruction on accomplice testimony should be given whenever the evidence tends to indicate that a witness adverse to the accused was culpably involved in a crime with which the accused is charged." Para. 7–10, DA Pam. 27–9, Military Judge's Benchbook at 7–15 (1982). *See generally United States v. Bernal,* 814 F.2d 175 (5th Cir.1987).

The military judge had correctly instructed the court members that Staff Sergeant Gray was an accomplice and that, as such, his testimony should be received with caution. It would seem, therefore, that the reference to accomplice testimony with respect to Staff Sergeant Gray would at least have reminded the court members that persons engaged in wrong-doing with an accused should have their testimony examined with particular care.[2]

Furthermore, all three women trainees and Sergeant Gray gave consistent testimony against appellant. Thus, this case involves testimony not of one witness, but of four different witnesses who testified consistently throughout the trial. Although it is true that multiple witnesses—just like a single witness—may be testifying falsely for their own purposes, here the multiple testimony always was consistent and, more importantly, there is no evidence whatsoever that there was any collaboration or plotting among them. Indeed, as observed by the Court of Military Review, "The testimony of the three students was by no means self-contradictory, uncertain, or improbable; to the contrary, it was clear and convincing as to the offenses of which the appellant was convicted." 29 MJ at 828. Based on these circumstances, we are convinced that McKinnie was not harmed by the judge's refusal to give the requested accomplice instruction.

### III

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.

2. During oral argument, appellate defense counsel contended, on the other hand, that because an accomplice instruction was given with respect to Staff Sergeant Gray and not given as to the three trainees, the court members might have inferred, under the circumstances, that Gray's testimony was to be viewed with suspicion, while that of the trainees was not. Even on this premise, it is difficult to believe that, in light of all the evidence—which appellant obviously did not completely refute—any prejudice could have emanated from the error.