**UNITED STATES**

v.

**Wallace J. MOORE, Sergeant (E–5), U.S. Marine Corps.**

**NMCM 9900266.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 18 April 1997.

Decided 25 Sept. 2001.

LT Mari–Rae Sopper, JAGC, USNR, Appellate Defense Counsel.*

Charles W. Gittins, Civilian Defense Counsel.

LT Kevin S. Rosenberg, JAGC, USNR, Appellate Government Counsel.

LT Jason A. Lien, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge, VILLEMEZ, and OZMUN, Appellate Military Judges.

OZMUN, Judge:

Contrary to his pleas, the appellant was convicted before members, including at least

---

\* March 27, 1966—September 11, 2001. LT Sopper left active duty in the Judge Advocate General's Corps of the United States Navy on ———, after serving her country as trial and appellate defense counsel from ———, 1997 to June, 2001. Tragically, she was amongst those claimed by the horrific September 11, 2001 terrorist attacks against the United States of America. LT Sopper was a passenger onboard American Airlines Flight 77, bound for California to begin her new career. Ultimately her aircraft was purposefully crashed into the Pentagon in Washington, D.C. With deep sadness we say goodbye to a zealous advocate, co-worker, and friend.

one-third enlisted members, of three specifications of violating a lawful general order, rape, adultery, and two specifications of indecent assault, in violation of Articles 92, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 920, and 934. He was awarded a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to the pay grade of E–1. The convening authority approved the sentence as adjudged.

We have examined and considered the record of trial, the appellant's assignment of errors, the Government's response, the appellant's reply, and the oral arguments of counsel. After taking corrective action we conclude that no error materially prejudicial to the substantial rights of the appellant remains. Art. 59(a), UCMJ, 10 U.S.C. § 859(a).

## Background

In May 1996, Private First Class (PFC) Ga reported for duty to Marine Corps Base Quantico. She met the appellant in June 1996 and ultimately complained that he sexually harassed her during the period 1 June 1996 through 15 September 1996. PFC Ga did not work for the appellant.

PFC B met the appellant in July 1996 when she reported to the appellant's unit and was in training under the appellant's supervision. Record at 365–66. During the period 1 to 31 July 1996, the appellant began to proposition her for sexual favors. PFC B repeatedly declined his advances. It finally culminated in late summer with the appellant grabbing PFC B's buttocks while at work on or about 23 July 1996. Record at 372.

PFC Gr met the appellant through PFC B. She ultimately claimed that the appellant sexually harassed her during the period 15 August to 5 September 1996, indecently assaulted her by placing his hand on her leg on or about 23 July 1996, and raped her on 1 September 1996. Immediately after sexual intercourse with the appellant, PFC Gr decided not to report it because she was afraid that she would not be believed as the appellant was a Sergeant (Sgt). However, on 17 September 1996, PFC Gr was approached by

the Criminal Investigation Division (CID) at Marine Corps Base, Quantico, Virginia regarding their investigation into the appellant's actions with PFC B. During the first meeting with CID, PFC Gr did not tell the investigators anything. They came back later in the day and she informed them of some minor information regarding the appellant, but nothing more. On the third visit by the investigators, she informed them that she had been raped. She was sent to Naval Criminal Investigative Service (NCIS) where she made a statement, but also signed a statement that indicated her desire not to cooperate or assist in the prosecution of the appellant. Defense Exhibit A.

The appellant was interviewed and made his statement the following day. He was immediately placed in pretrial confinement. On 2 October 1996, the investigators informed PFC Gr that she had tested positive for gonorrhea. She then completed an additional statement that claimed that the appellant gave it to her because she had not been with anyone sexually, other than the appellant, for the previous 9 months. Shortly thereafter, the appellant twice tested negative for gonorrhea.

PFC Gr repeated these facts during her testimony at the Article 32, UCMJ, hearing and during the pretrial motion phase of the appellant's court-martial. During the Article 32, UCMJ, hearing she also testified that she did not meet Private (Pvt) C, until late October 1996 and did not engage in sexual relations with him until December 1996. Pvt C would later contradict her testimony.

## Confrontation and Military Rule of Evidence 412[1]

In his first assignment of error, the appellant alleges that the military judge erred by failing to allow him to introduce evidence regarding Private First Class Gr's relationship with Pvt C. The appellant asserts that his Sixth Amendment right to confrontation was violated when the military judge would not allow him to cross-examine PFC Gr regarding the relationship and her prior false

1. Manual for Courts-Martial, United States (1995 ed.).

statements, and to introduce extrinsic evidence of the relationship.[2]

The majority of the evidence at issue comes by way of testimony from Pvt C. He testified during the pretrial motions that he had met PFC Gr in August of 1996 and began a sexual relationship with her on 31 August 1996. He also testified that they had sex, about 4 or 5 times, in her barracks room during September 1996, but that he visited her almost every day, sometimes twice a day. The evidence of his visits to her and the frequency of those visits were corroborated by the barracks logbook. Appellate Exhibit XXII.

The substance of the information that the appellant sought to introduce by way of cross-examination and testimony of a third party was that PFC Gr had lied in her 2 October 1996 statement to NCIS that she had not had sex with anyone for the preceding 9 months. She stated this fact after she learned she tested positive for gonorrhea and expressed her belief that the appellant gave it to her. She repeated this statement at the Article 32, UCMJ, hearing as well as during the pretrial motions. In addition, the appellant sought to introduce evidence about her sexual relationship with Pvt C to impeach her anticipated testimony regarding lack of sexual activity and to show her motive to fabricate. The counsel for the appellant asserted that PFC Gr's motive to fabricate included the fact that she valued her relationship with Pvt C, knew she had engaged in illegal activity with both Pvt C and the appellant, and because she thought the appellant gave her gonorrhea.

Prior to the trial the military judge denied the appellant an opportunity to cross-examine the prosecutrix regarding her statement that she had not had sex with anyone else for 9 months or to present evidence of her sexual relationship with Pvt C. He did allow the appellant the opportunity to introduce his negative test results for gonorrhea and ask PFC Gr if she stated she believed the appellant gave it to her, as a way of showing motive to fabricate. Appellate Exhibit XXIII at 3. He also allowed the appellant to ask her if she originally stated that she met her "friend" Pvt C in October.

We must pause to take exception to the military judge's characterization of the value of his ruling,[3] relevant to the known facts. Prior to his ruling, much evidence and argument was presented on this motion. The facts reveal that PFC Gr made her allegation of rape against the appellant on 17 September 1996, 15 days **before** she realized she had gonorrhea. Record at 133. Although the military judge found that allowing the defense to introduce the appellant's negative tests was ample to put the theory of her motive to fabricate before the members, based upon her belief that the accused gave her gonorrhea, we do not see the factual support for the military judge's conclusion in this regard. The chronology of the accusations of the victim indicate that any argument by the appellant that a motive to fabricate existed because the victim thought the appellant gave her gonorrhea is without any solid factual support, is of no relevance, and therefore, should not have been admitted at all.

The appellant also proffered a theory that PFC Gr had a motive to fabricate the rape allegation as a way of protecting her relationship with Pvt C. The military judge found that the testimony showed that there was little to support the theory that PFC Gr would lie to protect her relationship with Pvt C. The military judge indicated that Pvt C did not believe the relationship to be special, and after Pvt C went on restriction in a location that was distant from PFC Gr, she did nothing to rekindle the relationship, therefore, her motive to lie was weak. The military judge also found that since the relationship between PFC Gr and Pvt C was not unlawful, there was no motive to lie to protect it. He found this situation to be unlike the Supreme Court and Court of Military

---

2. We note that this issue was vigorously litigated with multiple requests for reconsideration.

3. The military judge reduced his rulings on the motions to writing and attached them to the record of trial. Appellate Exhibits XXIII, LXVI.

Appellate Exhibit LXVI is dated 9 March 1998, nearly 11 months after the trial and four days before the military judge authenticated the record of trial.

Appeals' cases where similar evidence was determined to be admissible.[4] The military judge also indicated that he had the discretion not to allow extrinsic evidence of her sexual acts to impeach her earlier statement that she never had sex with anyone else. Appellate Exhibit LXVI.

In her pretrial statements and her pretrial testimony it is clear that PFC Gr misrepresented the truth in regards to her belief as to why the appellant was the source of gonorrhea and the initiation of and extent of her relationship with Pvt C. However, her testimony at trial was noticeably different. At trial she stated that she originally thought the appellant gave it to her (without explaining why, pursuant to the military judge's order), and also testified that she no longer believed he gave it to her. Record at 440–41. She also testified that she was unsure when she actually met her friend, Pvt C, but it was sometime in September. Record at 442–43.

■ We note that absent MIL. R. EVID. 412, the prior false statements and the extrinsic evidence of the relationship with Pvt C would be admissible. Concerning the prior false statements, a military judge, pursuant to MIL. R. EVID. 608(b), has discretion to allow cross-examination regarding specific instances of misconduct when relevant to a witness' veracity. When such conduct is "in and of itself, directly probative of the witness' truthfulness . . . it is always relevant to the issue of that witness' credibility." *United ed States v. Stavely*, 33 M.J. 92, 94 (C.M.A.1991)(finding reversible error when the military judge did not allow cross-examination into the witness' prior falsehoods even though they were not made under oath); *see also United States v. Robertson*, 39 M.J. 211, 214–15 (C.M.A.1994). Likewise, a motive to fabricate, is normally admissible as long as it meets the minimum relevancy requirements

and passes scrutiny under the required balancing test.

■ The purpose of MIL. R. EVID. 412 is to prevent admission of evidence of a victim's past sexual behavior with persons other than the accused unless it is constitutionally required to be admitted. *United States v. Carter*, 47 M.J. 395, 396 (1998). The rule "is intended to shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to prosecutions of such offenses." *United States v. Hurst*, 29 M.J. 477, 480 (C.M.A.1990).

■ MIL. R. EVID. 412, must be read in connection with the other Military Rules of Evidence concerning relevance. *United States v. Sanchez*, 44 M.J. 174, 178 (1996). MIL. R. EVID. 401 and 402 provide that evidence which has "any tendency to make the existence of any fact . . . more or less probable than it would be without the evidence" is legally relevant and admissible. *United States v. Saipaia*, 24 M.J. 172, 175 (C.M.A. 1987). "Of course under Mil. R. Evid. 403, evidence which is both legally and logically relevant 'may be excluded if its probative value is substantially outweighed by the danger of undue prejudice.'" *Sanchez*, 44 M.J. at 178. Further, even if evidence is admissible under MIL. R. EVID. 401 through 403, MIL. R. EVID. 412 operates as a rule to exclude evidence as to the victim's reputation for chastity or evidence of specific sexual acts, unless those acts are constitutionally required to be admitted. *Sanchez*, 44 M.J. at 178; Mil. R. Evid. 412(b)(2)(B).

The Sixth Amendment to the U.S. Constitution provides in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to

---

4. In the cases cited by the military judge, the victim was engaging in an unlawful relationship with a third party. The cases. noted that the victim may have fabricated the allegations against the accused to protect the unlawful relationship. It was not the illegality of the relationship that was the crux of the decisions, but the value the victim placed in the relationship that he/she sought to protect. *See Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513

(1988); *United States v. Williams*, 37 M.J. 352 (C.M.A.1993). In addition to protecting any valued relationship (telling the third party whatever happened with the accused was not consensual on their part), illegality could only play a factor in a witness' motivation to fabricate if the accused was the only other person that knew about the illegal relationship, and thus could be able to expose it. The victim's motivation would then be a sort of preemptive strike.

have compulsory process for obtaining witnesses in his favor. . . .

The issue here is whether the excluded defense evidence "is constitutionally required to be admitted" under Mil. R. Evid. 412(b)(1).

The Supreme Court of the United States and the Court of Appeals for the Armed Forces have visited this issue on more than one occasion. Our superior court has noted that this issue is reviewed on a "case-by-case basis" where "relevance is the key to determining when the evidence is 'constitutionally required to be admitted.'" *Carter,* 47 M.J. at 396 (quoting *United States v. Jensen,* 25 M.J. 284, 286 (C.M.A.1987)). "To overcome the prohibition of Mil.R.Evid. 412, the defense must establish a foundation demonstrating constitutionally required relevance, such as 'testimony proving the existence of a sexual relationship that would have provided *significant* evidence on an issue of *major importance* to the case.'" *Carter,* 47 M.J. at 396 (quoting *United States v. Moulton,* 47 M.J. 227, 229 (1997)) (emphasis added). We review the military judge's decision that a sufficient foundation has not been established, thereby excluding the evidence, by an abuse of discretion standard. *Carter,* 47 M.J. at 397. If the excluded evidence is determined to be constitutionally required, it must be shown that the error was not harmless beyond a reasonable doubt before we will set aside the conviction. *Olden v. Kentucky,* 488 U.S. 227, 232, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988).

In *Olden,* the Supreme Court found a violation of the appellant's right of confrontation when the trial judge would not allow the defense to introduce independent evidence of, or cross examine the victim about her unlawful affair with a third party. The defendant indicated that the victim was lying to save her relationship with the third party. In finding error the Court noted that the accused had consistently asserted that consensual sexual acts occurred and that the victim lied about the lack of consent, thereby making credibility the major issue. The Court also indicated that a reasonable jury might have received a significantly different impression of the victim had the defendant been allowed to pursue his requested line of cross-examination. Lastly the Court held that the error was not harmless beyond a reasonable doubt where her testimony was essential to the conviction and was directly contradicted by the accused.

Our superior court has found on numerous occasions that an appellant's confrontation rights have been violated when a military judge found evidence to be inadmissible pursuant to MIL. R. EVID. 412, when such evidence was later held to be directly related to the defense theory of the case, motive to fabricate, and bias. *See United States v. Gray,* 40 M.J. 77 (C.M.A.1994); *United States v. Williams,* 37 M.J. 352 (C.M.A.1993); *United States v. Dorsey,* 16 M.J. 1 (C.M.A. 1983).

We believe the appellant's rights were not violated in this case. By allowing evidence of the sexual relationship between PFC Gr and Pvt C, based upon the proffer that PFC Gr fabricated the rape allegation against the appellant to protect the relationship she had with Pvt C, we would allow MIL. R. EVID. 412 to degenerate into an empty provision of law. Contrary to the facts in *Olden,* the relationship between PFC Gr and Pvt C was barely in existence, if at all. We agree with Appellate Government Counsel, that allowing this evidence, based upon these facts, would result in evidence being constitutionally required if a single act of sex occurred between two persons previous to, or near in time to, the victim being raped by a third party. Appellant has not met his burden of "demonstrating why the general prohibition in MIL. R. EVID. 412 should be lifted to admit evidence of the sexual behavior of the victim." *Carter,* 47 M.J. at 396. Although we disagree with some of the military judge's findings, we find that he correctly found that the "evidence [ ] violated both the spirit and letter of MRE 412" and "that the quality of the relationship [between PFC Gr and Pvt C] did not support the notion that [PFC Gr] would fear that it would suffer if [Pvt C] would learn that . . . she had sex with the accused." Appellate Exhibit LXVI at 2–3.

We come to the same conclusion regarding the requested cross-examination of the victim. Although the requested cross-examination focused on evidence that, absent MIL. R.

EVID. 412, would be admissible, the questions were aimed at evidence that was inadmissible under the rule. The military judge noted that because the quality of the sexual relationship caused him to preclude admitting evidence of it, the "defense may not cross examine [PFC Gr] on her ... sexual relationship." Appellate Exhibit XXIII at 5. We do not find this decision to be an abuse of discretion, especially considering the cross-examination the military judge did allow that was relevant to the victim's veracity.

Even assuming error, the error was harmless beyond a reasonable doubt. The correct standard for this inquiry is:

> [W]hether, assuming that the damaging potential of the cross-examination [and evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Olden,* 488 U.S. at 232–33, 109 S.Ct. 480 (quoting *Delaware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431). The first factor to consider is the strength of the Government's case. To do so we must examine not only the testimony of the victim, but also the testimony of the appellant and Prosecution Exhibit 2, the appellant's pretrial statement. The testimony of PFC Gr, the appellant's trial testimony, and his pretrial statement mirror each other in regards to the general facts. The testimony of the appellant differs from his own pretrial statement, and the testimony of the victim, only in regard to the "consent" element of rape.

As noted above, PFC Gr initially did not report the incident. Only after being approached three times by investigators, who were investigating another incident, did she indicate that she had been raped. She also signed a statement indicating her lack of desire in assisting or participating in the prosecution of the appellant for rape.

The incriminating portions of the appellant's statement consist of the following:

Q: Do you think the sexual intercourse you had with [PFC Gr] was consensual?

A: No.

. . . .

Q: Do you think [PFC Gr] consented to have sex with you?

A: No.

Q: Why did you have sex with [PFC Gr] if she did not consent to having sex with you?

A: She never said no after I pulled down her pants.

Q: When [PFC Gr] struggled when you were pulling her pants down, did you think she meant she did not want to have sex with you?

A: Yes.

. . . .

Q: Why did you have sex with [PFC Gr] if she verbally and physically told you she did not want to have sex?

A: Bad judgment.

. . . .

Q: Do you have anything further to add to this statement?

A: I would like to apologize to [PFC Gr] that I assumed something that was not true.

Prosecution Exhibit 2 at 6–7. The appellant testified at trial and explained what he meant by the answers he provided. He testified that:

> I asked [the investigator] first about the consensual part, and that's when he tried to break down his answer to me as far as whether or not she wanted to have sex with me. And it was my understanding that with me being a married man, she did not consent to having sex with me.... Essentially, sir, he just said, "Well, do you think [PFC Gr] wanted to have sex with a married man?" And basically my answer was no.

Record at 584. He also testified that other than using the word "rape" in the rights advisement, the investigators never used that term again. That they never talked about the use of force or explained the differences between adultery and rape. He reiterated during cross-examination that he told the investigator that "she did not want to have sex with me because I was a married man; but that she had sex with me, anyway, sir" and that "it was no rape." Record at 569, 571. The clear import from the appellant's testimony is that he was tired, wanted to be done with the interview, thought he only had committed adultery, and wanted to get his side of the story in front of his commanding officer. He also indicated that he failed to read the typed interview closely, if at all, and that the statement is not an accurate representation of what he really said that evening.

The strength of the Government's case is best revealed not in the testimony of PFC Gr, but in the highly incriminating statement of the accused. Therefore, we find that PFC Gr's credibility is of less importance than it would have been if the appellant had not admitted to the facts he did in Prosecution Exhibit 2.

Additionally, while considering the full impact the excluded evidence may have had, we note that the military judge did allow ample cross-examination of PFC Gr with regards to her earlier testimony about when she met Pvt C. Record at 442–44. He only concluded that the appellant could not cross-examine her about her earlier statement where she indicated that the sexual relationship did not begin until December. In addition, the appellant was allowed to cross-examine PFC Gr about her earlier testimony where she indicated that she believed the appellant gave her gonorrhea. Record at 440. Lastly, the appellant's counsel argued that PFC Gr had a motive to fabricate the rape allegation in order to prevent Pvt C from knowing that the sex was consensual. He said that "maybe [Pvt C's] friendship was going to later develop into a husband. Who knows? Maybe she didn't want him to know about it, the fact that she'd had sex with Sergeant Moore." Record at 649.

Looking at all the evidence, the strength of the Government's case, the importance of PFC Gr's credibility in light of Prosecution Exhibit 2, and the other avenues the military judge allowed for impeachment, we believe that if any error existed it was harmless beyond a reasonable doubt.

**Proper Publication of a General Order**

In his second assignment of error, the appellant alleges that the order of which he was convicted of violating was not properly published and disseminated at his base and thus it was not a valid and enforceable general order. The order in question was Secretary of the Navy Instruction (SECNAVINST) 5300.26B (sexual harassment). At trial the appellant raised a motion to dismiss the specifications alleging violations of SECNAVINST 5300.26B. The basis for the appellant's motions was that the specifications failed to state an offense (the actual unlawful conduct was not specified within the charge), that SECNAVINST 5300.26B was void for vagueness, and that the charges were multiplicious with other charges. Although not raised as a basis for dismissal, the appellant noted in his motion that the Government should have to produce a signed copy of the instruction and prove that it was properly promulgated in accordance with *United States v. Tolkach*, 14 M.J. 239 (C.M.A.1982). Appellate Exhibit XII at 1–2.

The military judge's ruling on this motion did not address the issue of proper promulgation. The trial counsel briefly addressed the *Tolkach* issue when he argued that absent some evidence of improper promulgation, a presumption of administrative regularity pursuant to *United States v. Johnson*, 37 M.J. 982 (A.C.M.R.1993), would satisfy the question of proper promulgation. Record at 173.

Thereafter, the trial counsel requested that the military judge take judicial notice of SECNAVINST 5300.26B. Record at 240. He presented the military judge with a copy of the instruction. Trial defense counsel objected to taking judicial notice because the copy was not signed. Record at 242. Trial counsel indicated that a signed copy would be produced by the next session of trial, but before that occurred he called witnesses to

establish the factual basis necessary for the military judge to take judicial notice of the instruction. Testimony during the litigation of the motion revealed that the Adjutant of Marine Corps Base, Quantico, never maintained a hard copy of the order in the Base Master Publications Library, but indicated that the SECNAVINST 5300.26B would be maintained by the Equal Opportunity Advisor. Record at 256. The Base Equal Opportunity Advisor (EOA) testified that he had received an advance-unsigned version of the instruction in January of 1993, which he disseminated to all the battalions. Record at 245. He further testified that after receiving and disseminating the advanced copy, he conducted two inspections of every battalion on base, one in 1994 and the other in 1996, and every battalion had the relevant instruction. Record at 250.

During the next session of the court-martial, the trial counsel offered a signed version of the instruction. Record at 264. The trial defense counsel objected again. His objections were based almost entirely on the fact that the signature was not authenticated. Record at 265. Over defense objection, the military judge admitted the order and took judicial notice of it. He indicated that he would add the defense requested language to his general judicial notice instruction, identifying that the instruction as a "signed copy of a regulation obtained from the office of the Secretary of the Navy." Record at 266. Trial defense counsel then indicated that he would only want the additional requested language in the instruction if the Government introduced evidence of where they received the instruction. Trial counsel indicated that he did not plan on introducing any additional evidence on the matter unless the trial defense counsel challenged the issue later. *Id.*

During the appellant's case-in-chief his counsel indicated he would call as witnesses the Marine Corps Base Adjutant and EOA to testify regarding the improper promulgation of the order. The military judge then indicated that:

I don't agree that the law requires that a signed copy be sent to this base. I agree that it is required that the order be signed by the appropriate authority.... I also agree that the order must be sent to a, quote, "central distribution authority," if you will, or a central location on board the installation, which I believe Gunny Johnson qualifies for. I do not believe that it is required that the order be further distributed to battalion level. I don't believe case law holds that.... I am not going to instruct the members that the law requires, that a signed copy be sent from Washington [DC] to Quantico or anywhere else for the order to be properly promulgated.

Record at 597. The trial defense counsel then indicated that, based upon the military judge's rulings, he would not call the witnesses unless the Government introduced evidence that the instruction was placed in the base central files. The military judge indicated that since he had taken judicial notice of the order, the members could consider it without any further evidence from the Government. He also indicated that the defense could still challenge the promulgation of the order at Quantico, but that for the purposes of judicial notice, he was satisfied that the copy sent to the Equal Opportunity Officer's office was sufficient promulgation. Record at 598.

The military judge finally indicated that if no further evidence regarding the order was admitted before the members, he would issue his standard judicial notice instruction. He stated that if "evidence was not forthcoming on the issue, then the presumption of regularity, the judicial notice of the order, was sufficient; and the members should not and would not be instructed on evidence that was not in existence." Record at 600.

No other evidence was admitted relevant to the instruction and at the conclusion of the merits the military judge instructed the members that:

I have taken judicial notice [of] ... SecNav Instruction 5300.26B ... [which] means that you are now permitted to recognize and consider this fact without further proof. It should be considered by you as evidence with all other evidence in the case. You may, but are not required to,

accept as conclusive any matter I have judicially noticed.

Record at 671.

The appellant has styled his assignment of error as attacking the legal effectiveness of the general order. We note, however, that the proper focus of this assignment of error is on whether the military judged properly took judicial notice of SECNAVINST 5300.26B.

■ MIL. R. EVID. 201 authorizes a military judge to take judicial notice of adjudicative facts and MIL. R. EVID. 201A authorizes judicial notice of domestic law. Subsection (a) of MIL. R. EVID. 201A recognizes that domestic law can be an adjudicative fact if it is a fact that is of consequence to the determination of an action. When an accused is charged with violation a general order, the actual order is an adjudicative fact of consequence and may be judicially noticed. *United States v. Ayers*, 54 M.J. 85, 90–91 (2000); *United States v. Mead*, 16 M.J. 270, 273 (C.M.A.1983); *United States v. Thompson*, 31 M.J. 781, 782–83 (A.C.M.R.1990). The purpose of taking judicial notice of the general order or regulation alleged to have been violated "is to satisfy the element of the offense on the existence of an operative general order or regulation." *United States v. Townsend*, 46 M.J. 517, 521 (C.G.Ct.Crim. App.1997), *aff'd* 49 M.J. 175 (1998).

■ The procedural requirements of MIL. R. EVID. 201, except subsection (g) apply when a court takes judicial notice of domestic law. MIL. R. EVID. 201A(a).[5] Pursuant to MIL. R. EVID. 201(c) the military judge may take judicial notice, whether requested or not.[6] When reviewing the military judge's determination to take judicial notice, we review it for an abuse of discretion. *United States v. Phillips*, 49 M.J. 521, 524 (N.M.Ct.

Crim.App.1998). There is an abuse of discretion where the reasons or rulings of the military judge are clearly untenable and deprive a party of a substantial right such as to amount to a denial of justice. *United States v. Weisbeck*, 50 M.J. 461, 464 (1999).

■ In this case the military judge indicated that he was taking judicial notice of the instruction because he believed that the law did not require a signed copy be delivered anywhere, only that it be signed by the appropriate authority. Record at 597. He also indicated that he believed that the Base Equal Opportunity Advisor's office would qualify as the official repository for this order, under the law, to be effectively promulgated. Record at 597–98.

The military judge was correct in ruling that a signed copy need not be delivered for a general order to have effectiveness. With regard to legal effectiveness of orders our superior court has found that it is "not necessary for the commander issuing a general regulation to [have] sign[ed] it personally [as long] as the *decisional* authority ... remains with the commander." *Ayers*, 54 M.J. at 90 (quoting *United States v. Bartell*, 32 M.J. 295, 296–97 (C.M.A.1991)) (internal quotations omitted). It follows that once an order is signed by the commander or his delegate, disseminated copies without a signature can not act to reverse the commander's decision to create the order in question. In this case, not only did trial counsel produce a signed copy of the instruction, it was personally signed by the Secretary of the Navy. The claims of the appellant in this regard "pale before the overwhelming evidence in this case that the [appropriate authority] issued the[ ] regulation[ ]." *United States v. Townsend*, 49 M.J. 175, 180 (1998). Moreover, evidence to the contrary is required to over-

---

5. Subsection (g) indicates that the military judge shall instruct the members that they may, but are not required to accept as conclusive any matter judicially noticed. This would lead to the conclusion that the military judge is required to instruct the members that they may disregard a law that has been judicially noticed, therefore that procedural requirement does not apply to MIL. R. EVID. 201A. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), App. 22, at A22–5.

6. MIL. R. EVID. 201(d) indicates that there are times when the military judge must take judicial notice. It is mandatory when a party requests the military judge take judicial notice of adjudicative facts and is supplied the necessary language. This standard indicates no discretion for the military judge and we believe it is limited to **facts** that are generally known universally, locally, or in the area pertinent to the event, or can be accurately determined and whose accuracy cannot be reasonably questioned.

come the presumption of regularity, and the appellant has presented none. *Id.* (citing *United States v. Masusock*, 1 C.M.A. 32, 35, 1 C.M.R. 32, 35, 1951 WL 1504 (1951)).

The military judge's decision to take judicial notice was well reasoned based upon his belief of what the law requires for promulgation. He believed that a general order needs to be delivered to an installation for it to have legal effect, and he believed the Equal Opportunity Advisor's Office was sufficient to meet that role. Moreover, "[a]n official document, such as the regulation at issue ... is entitled to a presumption of regularity if it appears regular on its face." *Ayers*, 54 M.J. at 91. His decision was based on a fair reading of the *Tolkach* case, was not an abuse of discretion, and we agree with his rationale.

*Tolkach* states that when an individual is charged with violation of a general order the prosecution need not allege or prove actual knowledge of the order. MCM, Part IV ¶ 16c(1)(d). However, before such knowledge may be presumed some proper publication is necessary. *Tolkach*, 14 M.J. at 241. In *Tolkach* the court held that publication would occur when the order was "received by the official repository for such publications on base, such as a master publications library. Then it is available for reference by all personnel." *Id.* at 244.

In *Tolkach*, the order in question was an order only applicable to the commands within the Eighth Air Force. At the accused's base, many subordinate units of the Eighth Air Force were stationed. Testimony in that case, by many, including the accused's commanding officer, was that they were completely unaware of the existence of the order. The court held that it would be a violation of due process without a showing of publication, especially where the conduct prohibited had never been prohibited in the past. *Id.* at 243–44. Clearly the thrust of the requirement for due process is with the knowledge or potential for knowledge of the prohibited conduct. *Id.* at 244 n. 5 (indicating that the term "master publications library" is an Air Force term and that the other services most likely have other terms for the places that would function as their equivalent).

We do not believe our superior court fashioned some inflexible rule regarding the channels to disseminate, or location of the order to achieve proper publication. *Id.* at 244 (noting other channels of distribution to achieve notice to persons affected could be acceptable). We believe that the potential for knowledge is all that is required to satisfy due process. Accepting the appellant's argument on its face would lead to illogical results where an instruction could be delivered to every command, unit, and detachment on an installation, but found to be improperly promulgated because the central files repository didn't maintain a copy. Additionally, the facts of the case indicate that he had actual notice.[7]

Not only was the military judge's decision well reasoned, it did not deprive the appel-

---

7. First, the appellant received sexual harassment training and later received counseling regarding his behavior in 1995 that was perceived by his command as constituting sexual harassment. *See* Prosecution Exhibit 4. More importantly, the following exchange between the appellant and his own counsel took place, during the case on the merits:

Q: Now, did you—have you ever read the Sec-Nav Instruction on sexual harassment?

A: No, sir.
....

Q: Had you ever read it personally yourself before the Article 32?

A: No, sir. Whenever we got done with sexual harassment training, they would say that ... the different types of military orders are in battalion, and it's our duty to go there and pick it up and read it on our own. Basically at our own leisure, sir.

Q: Had you ever done that?

A: No, sir.

Q: What did you think they meant by where you were supposed to go?

A: Basically as far as my preference, sir, if I ever had to look up an ... Order, it was because it just happened; something that happened that I needed to look something up. I at the time didn't have enough initiative to go seek that out.

Q: But where would you go if you had?

A: You have to go to battalion. It was inside the battalion somewhere, sir.

Record at 577–78. Moreover, although this order was newly promulgated, it was a rewrite of an existing instruction that merely reaffirmed, in punitive terms, what had already been prohibited. *See United States v. Daniel*, 42 M.J. 802 (N.M.Ct.Crim.App.1995).

lant of a substantial right. The military judge offered to tailor his judicial notice instruction to allow the appellant to present witnesses and attack the promulgation of the order. The appellant declined the military judge's offer. The military judge indicated that if the appellant presented evidence to attack the promulgation of the order he would instruct the members that:

> The law of Article 92, [UCMJ], 10 U.S.C. § 892, relating to general orders and regulations requires that such orders must be properly promulgated before they can be enforced without actual knowledge on the part of an accused. Promulgation of a general order or regulation requires delivery from the issuing authority—in this case, Office of the Secretary of the Navy [ ] to a central depository on board Marine Corps Base, Quantico, Virginia. The transfer of the signed copy of the regulation is not required to accomplish effective promulgation. So as long as that is accomplished, that is, delivery of SecNav Instruction 5300.26 bravo from SecNav to a central depository at Marine Corps Base, Quantico, in this case actual knowledge of SecNav Instruction 5300.26 bravo, with the appropriate dates and change, on the part of the accused is not required to be pleaded as an element of the offenses under Additional Charge II, nor is it an element of these offenses.

Record at 597–98. The military judge indicated that he took judicial notice of the instruction, but that the appellant could "put on evidence that it was not properly promulgated—that is, that it was not sent to a central depository at Quantico, [he] could do so." Record at 598. The appellant chose not to do so and the instruction was not given.

The military judge also gave the general instruction on judicial notice that allowed the members to disregard what he has judicially noticed. Record at 671. This is a further indication that the ruling did not deprive the appellant of a substantial right.

The assignment of error is without merit.

### Accomplice Instruction

In his third assignment of error, the appellant alleges that the military judge abused his discretion by refusing to give an accomplice instruction. Appellant argues that because he was charged with adultery involving two females, each would be an accomplice to the crime and therefore the instruction should have been given.[8] The Government contends that the military judge was correct because there was no factual question regarding the elements of adultery as shown by the appellant's admission. Government's Answer of 15 Sep 2000 at 19. The appellant contends that the instruction would have highlighted the victim's motive to fabricate and allege rape.[9]

In addition to being charged with the rape of PFC Gr, the appellant was charged with adultery. At the time of the sexual intercourse, the appellant was married to another female. The single act of sexual intercourse between the appellant and PFC Gr provided the basis for both adultery and rape. The appellant's statement supplied the necessary elements for the adultery charge. Prosecution Exhibit 2.

 We review a military judge's decision not to give a defense-requested instruction under an abuse of discretion standard.[10]

---

8. We note that he was acquitted of one of those charges, therefore the argument with respect to that female, is moot. Be that as it may, the appellant feels prejudiced because the government's theory of the case, as argued in closing, was that this case was not just the word of one person against the appellant, but it was the testimony of 5 persons against the word of the appellant. We caution against such arguments because they invite "spillover."

9. At the outset, it must be said that by definition, the victim of a rape cannot be an accomplice to the same rape. We note that the appellant is essentially seeking an instruction on one offense to impeach the credibility of testimony relative to another offense. We also note that the rationale for this type of instruction is to help the finders of fact evaluate the credibility of the witness with regard to the offense for which he may have been an accomplice. The appellant's argument runs contrary to the rationale of this rule.

10. During oral argument the appellant's counsel indicated that the standard is not an abuse of discretion. He indicated that when there is some evidence presented, the military judge must give the requested instruction. We disagree with his assertion. We believe that discretion the military judge employs in his decision on wheth-

*United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A.1993). "The military judge 'has substantial discretionary power in deciding on the instructions to give.'" *United States v. Smith,* 50 M.J. 451, 455 (1999) (quoting *Damatta–Olivera,* 37 M.J. at 478). There is an abuse of discretion where the reasons or rulings of the military judge are clearly untenable and deprive a party of a substantial right such as to amount to a denial of justice. *Weisbeck,* 50 M.J. at 464. When the evidence raises a reasonable inference that a witness may have been an accomplice, the military judge shall give the cautionary instruction. *United States v. Gittens,* 39 M.J. 328, 331 (C.M.A.1994) (citing *United States v. Gillette,* 35 M.J. 468, 470 (C.M.A. 1992)).

■■■ In *Gillette* the witnesses testified, pursuant to grants of immunity, that they had used cocaine with the accused or been present when he used cocaine. *Gillette,* 35 M.J. at 469. The court found no error in giving the instruction to the members that the members were to decide whether 2 of the 3 witnesses (the ones who witnessed his use) were accomplices, rather than instruct them that they were accomplices as a matter of law, as he did with the witness that admitted to use with the accused. In *Gittens,* the court noted that the military judge did not err when he declined to give the accomplice instruction. The court noted that the record failed to suggest which if any witness might have been an accomplice of the accused. *Gittens,* 39 M.J. at 331.

In *United States v. McKinnie,* 32 M.J. 141 (C.M.A.1991) the court found prejudicial error where the military judge refused to give the requested accomplice instruction. In that case four witnesses testified against the accused in a fraternization case. The accused was an instructor (SSgt) at an Army School. Another instructor (SSgt) and three female students (Pvt, Pvt, and Spc) testified against the accused. Each testified regarding the drinking and sex parties at the appel-

lant's off-post apartment. The military judge gave the accomplice instruction regarding the other SSgt, but indicated that he would not do so relative to the three females because they were victims, not accomplices. *Id.* at 142. The court held that it was error, but that it was not prejudicial.[11] The court indicated that they were not victims as the conduct in question was prohibited by them as well as the accused. The court focused on whether the females could have been prosecuted and convicted for the same offense as the accused. The facts of that case indicate that the accused did not testify or admit to the offenses, therefore the offenses charged were fully contested.

Considering the appellant's pretrial statements to determine whether the instruction should be given, we would still agree with the military judge. A non-willing participant in a criminal act, cannot be said to be an accomplice. The pertinent parts of the accused's statement include the following questions and answers:

Q: Do you think [PFC Gr] consented to have sex with you?

A: No.

Q: Why did you have sex with [PFC Gr] if she did not consent to having sex with you?

A: She never said no after I pulled down her pants.

Q: When [PFC Gr] struggled when you were pulling her pants down, did you think she meant she did not want to have sex with you?

A: Yes.

. . . .

Q: Why did you have sex with [PFC Gr] if she verbally and physically told you she did not want to have sex?

A: Bad judgment.

. . . .

Q: Do you have anything further to add to this statement?

---

er evidence was presented that raises a reasonable inference that a witness may be an accomplice.

11. The court noted that the rationale behind the rule was to aid the finder of fact to assess the

credibility of the witness. It noted the trial defense counsel's cross-examination, the general instructions on credibility, and the prosecution's evidence as reasons for finding no prejudice.

A: I would like to apologize to [PFC Gr] that I assumed something that was not true.

Prosecution Exhibit 2 at 6–7. The appellant's statement indicates that PFC Gr did not consent to the sexual intercourse. We find the appellant's explanation for his answers, that he meant that she did not want to have sex with him because he was a married man, to be incredible. Record at 569–70. Furthermore, on its face, this statement makes clear that the victim did not want to engage in sexual relations with him.

Considering the appellant's statements at trial we note that the appellant indicated he was married to someone else. Record at 517, 562. He testified that he had intercourse with a female not his wife. Record at 529, 567. He also testified that he told her the next time it would be better because they "wouldn't have to be quiet,[ ] wouldn't have to sneak around,[and] it would better her chances of not getting in trouble." Record at 531. He later added that he "knew [he] had intercourse with [PFC Gr]. I made a mistake." Record at 549.

The elements of adultery are:

(1) That the accused wrongfully had sexual intercourse with a certain person;

(2) That, at the time, the accused or the other person was married to someone else; and

(3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

MCM, Part IV, ¶ 62b. Our superior court has indicated that the accomplice instruction is given to highlight the credibility issues that are involved when "two persons are involved in the same crime" where because of "human nature ... each will frequently try to shift most of the blame to the other." *McKinnie*, 32 M.J. at 144.

Here, after considering the evidence, no element of adultery remained uncontested. The military judge noted that "[I]n the case of PFC [Gr], it is just simply not appropriate under the evidence as it has been presented in this case to give the accomplice instruction." Record at 630. What the appellant wanted was the spillover effect the instruction on adultery would have upon the contested offense of rape.[12] He wanted to argue that the victim falsified a rape allegation so as not to get into trouble for adultery. Appellant's Brief of 22 Mar 2000 at 15–16. Based upon the record, the military judge's decision to not give the accomplice instruction on adultery to help the appellant contest the rape charge was not an abuse of discretion.

Even if failure to instruct was an error, no relief will be granted if the error was harmless. *McKinnie*, 32 M.J. at 144–45. Our superior court noted that the:

[R]ationale behind requiring an accomplice instruction goes to reliability of the accomplice witness and, by giving detailed instructions for assessing the [accomplice's] credibility, the military judge adequately brought the same concern to the attention of the court members.

*Id.* at 144. Here, the military judge gave instructions concerning credibility of the witnesses in general and PFC Gr specifically. Record at 670, 672. In addition, the appellant's counsel vigorously attacked the credibility of PFC Gr, indicating, amongst other things, that:

[S]he has a motive to misrepresent this allegation and stretch it up from adultery to rape ... [and] this anger that she has committed a criminal act, adultery ... that anger has to have an outlet. And what we submit is that she always has to worry about being prosecuted for adultery when she testifies. And she knows as an MP that she's got to stick to her story.

Record at 653. The appellant argued the very point he sought to make, that she turned her participation in adultery into being a victim of rape. Clearly no harm to his case was done by the military judge's decision on the accomplice instruction.

### Illegal Pretrial Confinement

In appellant's fourth assignment of error, he argues that he is entitled to additional

---

**12.** Appellant's counsel so indicated in the Oral Argument before this court of 31 July 2001.

administrative pretrial credit for the government's violation of RULE OF COURTS-MARTIAL 305, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Specifically, he argues that the commanding officer and the initial review officer failed to consider the adequacy of lesser forms of restraint as required by R.C.M. 305(h)(2)(B)(iv).

The appellant was placed in pretrial confinement on 18 September 1996. Appellate Exhibit VI. The stated reason for his pretrial confinement was as "a result of an ongoing CID investigation that revealed allegations [the appellant] raped ... one female Marine and ... committed an indecent assault upon another." Commanding Officer, Security Battalion letter of 20 Sep 1996 (Appellate Exhibit I at 5). What was missing from this letter and the focus of this assignment of error was that the letter did not indicate that the command had considered lesser forms of restraint and considered them to be inadequate. R.C.M. 305(h)(2)(B)(iv). Prior to trial, the appellant moved the trial court to release him from pretrial confinement based upon this omission. The Initial Review Officer (IRO) was called to testify. In doing so, he noted that the command's letter was deficient in that matter, but it was not his duty to consider whether lessor forms of restraint were adequate. Record at 46. He further stated that based upon his "personal knowledge of the different cases that came through Security Battalion, [he was] led [ ] to believe that they had considered lesser forms of restraint and would not have ordered the [appellant] into pretrial confinement had they not considered that they were inadequate." Record at 47.[13] We note that R.C.M. 305(i)(1) requires the IRO to review the adequacy of the probable cause determination as well as the necessity of continued pretrial confinement. Specifically, R.C.M. 305(i)(A)(iii) indicates that the IRO's standard of proof for his review if that "[t]he requirements for confinement under subsection (h)(2)(B) of this rule must be proved beyond a preponderance of evidence." As stated earlier, subsection (h)(2)(B) includes the consideration of the adequacy of lesser forms of restraint.

First, we cannot agree with the IRO's flawed logic that caused him to conclude that the command must have considered lesser forms of restraint and determined them to be inadequate because they sent the appellant into pretrial confinement. We also could not disagree more with the IRO's contention that it was not his responsibility to review whether lesser forms of restraint were adequate because the commanding officer already considered that factor. This review process "may not be turned into an empty ritual, and ... IROs may not abdicate their decision-making authority through the 'mere ratification of the bare bones conclusions of others.'" *United States v. Fisher*, 37 M.J. 812, 818 (N.M.C.M.R.1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Thereafter, the military judge denied the appellant's motion for release from pretrial confinement, based upon the alleged acts of noncompliance, on day 157 of the appellant's pretrial confinement. The military judge also determined that lesser forms of restraint were inadequate. Appellate Exhibit VI at 7.

Although we review issues such as illegal pretrial confinement and the continued confinement decision under an abuse of discretion standard, *see United States v. Gaither*, 45 M.J. 349, 351 (1996), the military judge's application of R.C.M. 305 is reviewed *de novo*. *United States v. Plowman*, 53 M.J. 511, 512 (N.M.Ct.Crim.App.2000). There are two aspects that could be subject to review in any pretrial confinement situation, whether the detainee should continue in pretrial confinement and whether the confinement already served is illegal. *Gaither*, 45 M.J. at 351. Whether pretrial confinement is legal can be further divided into illegal pretrial confinement and failure to comply with procedural rules. R.C.M. 305(j)(2) indicates that administrative credit shall be ordered by the military judge for either the noncompliance with R.C.M. 305(f), (h), (i), or (j), or an abuse of discretion. Although the rule fails to indi-

---

13. The IRO testified in response to the question whether he considered the adequacy of lesser forms of restraint that the "decision is pretty much made by the commanding officer of the detainee. I don't necessarily consider whether they're appropriate, no." Record at 46.

cate whose abuse of discretion would warrant credit, our court has indicated that an abuse of discretion by either the commanding officer or initial review officer may warrant such credit. *Fisher,* 37 M.J. at 816.

As the military judge correctly noted, the appellant sought, at trial, not credit for this error, but release or reclassification. Appellate Exhibit VI at 1, 8. The closely related issue of illegal pretrial punishment is not waived when an appellant fails to raise it at trial. *United States v. Scalarone,* 54 M.J. 114, 117 (2000); *United States v. Huffman,* 40 M.J. 225, 227 (C.M.A.1994). However, failure to raise the issue of noncompliance with the procedural requirements of R.C.M. 305, will waive the issue on appeal. *United States v. McCants,* 39 M.J. 91, 93 (C.M.A. 1994). In *McCants,* the appellant sought administrative credit, pursuant to R.C.M. 305(k), for a failure to conduct a timely magistrate's review. Although he did request administrative credit, pursuant to R.C.M. 305(k) for various other instances of noncompliance with R.C.M. 305, our superior court held that "failure to make a motion for appropriate relief constitutes waiver" of this alleged act of noncompliance. *McCants,* 39 M.J. at 93. Similarly, requesting relief for illegal pretrial punishment will not raise issue of administrative R.C.M. 305(k) credit. *United States v. Chapa,* 53 M.J. 769, 772 (Army Ct.Crim.App.2000).

Therefore, absent plain error, the issue of administrative credit for noncompliance with R.C.M. 305 was waived. *United States v. Powell,* 49 M.J. 460, 464–65 (1998). We must first note that the appellant raised the identical issue of noncompliance at trial as he now does on appeal. However, the requested remedy has changed from release to credit. We find it curious that the appellant's counsel would request release from pretrial confinement based upon noncompliance with R.C.M. 305(h) when R.C.M. 305(k) indicates that the "remedy for noncompliance with subsections (f), (h), (i), or (j) of this rule shall be an administrative credit against the sentence adjudged" and does not indicate release as an appropriate remedy. The decision to request release and not credit can be best understood by considering that the ap-

pellant styled his motion as an abuse of discretion rather than a strict noncompliance of procedural rules. R.C.M. 305(j)(1) does indicate that a military judge may order release of a detainee when the IRO abused his discretion and there is not sufficient information presented to the military judge to justify continued pretrial confinement.

The appellant's argument, while framed as an abuse of discretion by the commanding officer and initial review officer, is more properly analyzed a straight noncompliance with the requirements of R.C.M. 305. Each individual is alleged to have failed to properly execute his duty, not that they abused their discretion in carrying out their duties.

The appellant first complains that the commanding officer's 20 September 1996 letter fails to indicate that he considered lesser forms of restraint as required by R.C.M. 305(h)(2)(B) and (C). However, R.C.M. 305(h)(2)(C) does not require that those specific words be contained in the letter, but that the "reasons for the conclusion that the requirements for confinement in subsection (h)(2)(B) of this rule have been met." We find that the information contained within that letter is more than sufficient to support a conclusion that lesser forms of restraint would be inadequate. Not only does the letter indicate the seriousness of the offenses and the commander's opinion that the appellant was a flight risk, but also that the appellant was counseled previously for harassing behavior, he has a history that shows a propensity for violence, is a danger to others, and had made various attempts to engage in sexual relations with other female Marines in the area. Appellate Exhibit II. Therefore, because it is not clear and obvious that the commanding officer did not consider lesser forms of restraint and found them to be inadequate, even if there was error, it was not plain error.

▮ On 23 September 1996, the appellant had his hearing before the IRO. The military judge correctly noted that the hearing officer erred by not considering the adequacy of lesser forms of restraint. Appellant Exhibit VI at 6. On 21 February 1997, when the military judge made his findings he indicated that "based on the matters before the

IRO, this court finds that lesser forms of restraint *were* inadequate." *Id.* at 6–7.

We find that the IRO's admitted failure to consider· the adequacy of lessor forms of restraint is plain error.

In the context of R.C.M. 305(k), we construe the phrase "as a result of such noncompliance" to require additional administrative credit from the date when a required event should have occurred under R.C.M. 305 until the date the required event does occur. *Plowman,* 53 M.J. at 513. If the deficiency is corrected by a reviewing authority within the time period for the original action, no credit shall be given. *Id.* at 514 n. 11. The courts have even interpreted the issue to be one that does not require prejudice before relief is granted. *McCants,* 39 M.J. at 93–94; *United States v. DeLoatch,* 25 M.J. 718, 719 n. 3 (A.C.M.R.1987)(indicating that the argument that no portion of confinement can be said to be the result of a late IRO hearing that does correctly continue confinement, hence no additional credit should be given violates the spirit, if not the letter of the rule, which is to provide a remedy from the date of when an occurrence should take place and the date it actually does).

We believe this error, as noted by the military judge, is one that would have required him to *sua sponte* delve into the area of additional credit per R.C.M. 305. We will order 151 days of R.C.M. 305(k) credit, for the period from the IRO's hearing to the military judge's findings, be applied against the appellant's sentence over and above credit already given.

## Non–Unanimous Verdicts and Member Panels with less than 12 Members

In his last assignment of error; appellant alleges constitutional error in the military justice system for allowing conviction when the number of impaneled members is less than twelve and when an accused can be convicted on less than a unanimous verdict. These arguments have been raised numerous times and summarily dismissed. *United States v. Rojas,* 15 M.J. 902, 919 (N.M.C.M.R.1983). "[C]ourts-martial have never been considered subject to the jury-trial demands [such as minimum size and unanimous verdicts] of the Constitution" that are required in other federal criminal cases. *United States v. McClain,* 22 M.J. 124, 128 (C.M.A.1986). This assignment of error is without merit.

## Conclusion

We affirm the findings and sentence affirmed on review below. We order an additional 151 days of credit towards his sentence to confinement.

Senior Judge DORMAN and Judge VILLEMEZ concur.