# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39600**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Joshua C. WHITE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 15 July 2020

———————————

*Military Judge:* Bradley A. Morris (arraignment); Matthew D. Talcott.

*Approved sentence:* Dishonorable discharge, confinement for 4 years, reduction to E-1, and a reprimand. Sentence adjudged 29 August 2018 by GCM convened at Barksdale Air Force Base, Louisiana.

*For Appellant:* Major Rodrigo M. Caruço, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Michael T. Bunnell, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge POSCH joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas pursuant to a pretrial agreement (PTA), of nine specifications of varying degrees of assault in violation of Article 128, Uniform Code

of Military Justice (UCMJ), 10 U.S.C. § 928, and one specification of communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved a sentence of a dishonorable discharge, confinement for four years, reduction to the grade of E-1, and a reprimand, pursuant to the terms of the PTA.

On appeal, Appellant personally raises four issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).[2] Appellant asserts the military judge erred by: (1) not granting illegal pretrial confinement credit for time Appellant spent on medical and suicide watch at a civilian confinement facility and not granting an additional day of administrative credit for noncompliance with pretrial confinement review procedures; (2) allowing testimony in the Government's case in aggravation about a crime Appellant was not convicted of and permitting rehabilitative-potential opinion evidence from two witnesses; and (3) allowing particular information to be submitted to the court in an unsworn victim impact statement. Appellant's fourth assertion is that his post-trial confinement conditions amount to cruel and unusual punishment, a claim we find to be without basis and that warrants neither extended discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).[3] In addition, we consider whether Appellant is entitled to relief for untimely appellate review. Finding error with respect to the military judge's ruling regarding sentence credit, we take corrective action in our decretal paragraph. Finding no other error materially prejudicial to Appellant's substantial rights, we affirm the findings and the sentence.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant submitted five issues. We have combined his two errors regarding sentencing credit into a single error for purposes of this opinion.

[3] The information purporting to serve as the factual basis for the allegations of unconstitutional post-trial punishment is contained solely in an Appendix to a brief signed and filed by Appellant's appellate defense counsel. Appellant filed a declaration discussing his pretrial confinement, but that declaration is silent as to post-trial confinement conditions, and there is no other evidence in the record supporting the allegations Appellant's counsel makes on his behalf. Without any evidence of Appellant's complained-of post-trial confinement conditions, we have no basis for concluding such conditions exist, much less that they amount to unconstitutional punishment.

## I. BACKGROUND

Seven of the specifications Appellant was convicted of stem from his tumultuous marriage marked by his increasingly violent and threatening behavior towards his wife, KW. The remaining three arose from Appellant's violent reaction to law enforcement personnel attempting to transfer him from a medical facility back to the military confinement facility where he was being held in pretrial confinement.

Appellant's earliest charged offense was an aggravated assault which occurred in July 2017, approximately six years after he and KW married. Appellant and KW were arguing at their on-base residence when Appellant wrapped his arm around KW's throat and strangled her until she lost consciousness, an episode witnessed by the couple's oldest daughter who was five years old at the time.

In late December 2017, Appellant, KW, and their two daughters were getting ready to leave their house to go to dinner at a local restaurant. Appellant and KW had been arguing, and KW put their daughters in the back seat of her car while Appellant was still in the house.[4] When Appellant came outside, he grabbed KW's neck and pushed her head into the side-view mirror of his truck while his daughters watched. KW got into the driver's seat of her car, and when Appellant got in on the passenger side, he used his hand to push KW's head into the driver's-side window while the car was still parked in the driveway of their residence.

The next day, KW took her daughters to visit Appellant's family who lived about two and a half hours away. At KW's request, Appellant stayed at home rather than go on the trip, and KW and the girls returned that evening accompanied by Appellant's grandmother. When they arrived at the house, they found Appellant outside packing things into his truck. Appellant began arguing with both KW and his grandmother, and the group eventually went into the house. Appellant, still upset, retrieved a bolt-action rifle from his truck, then came back inside and locked the front and back doors and closed the blinds in the front room of the house. While continuing to argue with his grandmother and KW, who had her younger daughter in her lap, Appellant waved the rifle in KW's general direction. Neither KW nor Appellant's grandmother knew whether or not Appellant's rifle was loaded, and when KW told Appellant she was holding his child, Appellant said, "Don't worry, it will miss her." Appellant's older daughter feigned an asthma attack and asked for her inhaler, giving KW the opportunity to distract Appellant, during which time Appellant's grandmother ran out of the house and called 911. When Appellant was

---

[4] Appellant's younger daughter turned three years old the next day.

apprehended, his rifle was found to be unloaded, and he was subsequently released.

Just over a month later, on 4 February 2018, Appellant and KW were sitting at a heavy table talking about their relationship. By this point in time, Appellant had moved out of the house, but he was returning to visit his family each day. During the conversation, Appellant became angry and flipped the table over onto its side, striking KW's legs with the table. Appellant wanted KW to go upstairs with him to continue the argument, but she refused, leading Appellant to try and carry KW up the stairs against her will. As KW struggled to get away from Appellant, he tripped and she hit her head on the wall of the staircase.

The next night, Appellant drove to the house and snuck inside to KW's bedroom—carrying an unsheathed hunting knife—where KW was lying awake on the bed. Appellant took KW's phone away from her and put the knife to her ribcage. Each time KW tried pushing Appellant's hand away, he would put the knife back against her ribs. KW pleaded with Appellant to calm down, as Appellant erratically vacillated between being angry and crying. Eventually, KW convinced Appellant to sit on the bed, and he set the knife on a bedside table. As the two continued talking, Appellant would periodically look at the knife and look back at KW and make a motion as if he was going to grab the knife whenever he started getting upset. Worried that Appellant was going to either hurt or kill her, KW decided to employ a degree of intimacy in the hopes of getting Appellant to realize what he was doing and stop his threatening behavior. This ploy led to the couple having sexual intercourse, after which Appellant sheathed the knife and left the house. KW testified that she did not feel like she had any other choice at the moment but to have sex with Appellant and that she did not want to have sex with him.[5]

The following day, on 6 February 2018, KW reported the previous night's incident to Appellant's first sergeant, leading to Appellant being involuntarily admitted to a civilian mental health facility for inpatient treatment. On 22 February 2018, Appellant's commander ordered him into pretrial confinement in the base confinement facility, but his commander did not complete her 72-hour review of that order until 26 February.

On 9 March 2018, the base confinement facility personnel reported Appellant was unresponsive after an apparent suicide attempt, and Appellant was taken to a local hospital for evaluation. Once Appellant was told he was cleared

---

[5] Appellant was charged with both aggravated assault and rape for these events, but the Government withdrew and dismissed the rape charge with prejudice pursuant to the PTA.

to leave the hospital and return to pretrial confinement, Appellant became enraged and verbally and physically attacked those around him, to include the two military law enforcement noncommissioned officers who were present to escort Appellant back to the base confinement facility. During the ensuing scuffle, Appellant scratched one noncommissioned officer's hands and pushed the leg of another. Appellant further threatened to break one of the noncommissioned officer's hands.

Rather than return Appellant to the base confinement facility after the attack, military authorities arranged for Appellant to be held for trial at the Bossier Maximum Confinement Facility ("Bossier Max"), a nearby civilian jail, where he remained until his transfer back to the base confinement facility on 16 April 2018. Appellant spent four days at the base facility before being transferred to the Naval Consolidated Brig in Charleston, South Carolina, where he remained until his court-martial.

While at Bossier Max, Appellant was periodically placed on medical or suicide watch because he made a number of suicidal gestures. Even when he was not on such status, he was kept administratively segregated from the jail's general population at the request of Air Force officials. As a result, Appellant was housed in a cell by himself, and he was released for an hour each day, during which time he could use a small recreation yard, shower, or make phone calls. While on medical or suicide watch, Appellant was still afforded the hour outside of his cell (although only three times a week while on suicide watch), but he was visually checked at regular intervals—either in person or via camera—by Bossier Max personnel. Had Air Force officials not requested Appellant be segregated from the rest of the jail population, he would have been placed in general population once medically cleared, a status which would have permitted Appellant to both interact with other prisoners and have the opportunity to be outside of his cell for some ten hours a day.

## II. DISCUSSION

### A. Sentence Credit

At trial, Appellant made a motion for appropriate relief for illegal pretrial punishment and received partial relief from the military judge, discussed in greater detail below. Appellant now contends he should receive additional credit against his sentence. Specifically, he argues he should receive an additional 51 days credit based upon the time he spent on medical and suicide watch at Bossier Max and 1 day for his commander's failure to conduct her pretrial confinement review within 72 hours. We disagree with Appellant with respect to his time at Bossier Max, but we do agree with him regarding the 72-hour review.

**1. Conditions of Pretrial Confinement Raised at Trial**

Starting on 6 February 2018, Appellant involuntarily spent 17 days in an inpatient mental health treatment program. The parties at trial, along with the military judge, agreed the conditions at this facility were tantamount to confinement and warranted pretrial confinement credit. *See United States v. Mason*, 19 M.J. 274 (C.M.A. 1985). At the end of this treatment program, Appellant was ordered into pretrial confinement on 22 February 2018, and he remained confined until the date his sentence was adjudged, 29 August 2018, amounting to 188 days. Of those 188 days, Appellant spent 38 days at Bossier Max, 17 of which involved Appellant being on either medical or suicide watch due to his multiple suicidal gestures. Appellant was in administrative segregation for the remaining 21 days at Bossier Max.

In his motion at trial, Appellant requested he be credited for an additional 114 days of confinement credit for the 38 days he spent at Bossier Max; that is, three days of credit for each day he was confined there. Appellant's motion was based upon the assertion he had been placed in "solitary confinement."[6] The military judge found a legitimate, non-punitive purpose behind Appellant's placement on medical and suicide watch, declining to grant additional credit for those 17 days. He agreed with the Defense that Appellant's placement in administrative segregation for the remaining 21 days was more rigorous than required and served no reasonable government objective. *See* Rule for Courts-Martial (R.C.M.) 305(k); *United States v. Suzuki*, 14 M.J. 491 (C.M.A. 1983). As a remedy, the military judge ordered an additional 63 days of credit against Appellant's sentence—three days of credit for each of the 21 days he spent in administrative segregation when he was not on medical or suicide watch.

Thus, with the inpatient treatment time (16 days), the time in pretrial confinement (188 days), and the additional pretrial confinement credit granted by the military judge (63 days), Appellant's total credit towards his sentence amounted to 267 days.

Article 13 of the UCMJ, 10 U.S.C. § 813, prohibits the pretrial punishment of an accused who is awaiting trial, as well as the imposition of confinement conditions "more rigorous than necessary to secure [an accused's] presence for trial." *United States v. Palmiter*, 20 M.J. 90, 93 (C.M.A. 1985). Embodied in the concept of pretrial punishment is the concept that there must be an actual intent to punish the accused. *United States v. McCarthy*, 47 M.J. 162, 165

---

[6] Appellant initially also asserted he received "inadequate nutrition" at Bossier Max, but he withdrew that basis prior to the military judge's ruling.

(C.A.A.F. 1997). The military judge found Appellant's confinement in administrative segregation to be more rigorous than necessary, and we do not disturb this determination.

We also conclude the military judge did not abuse his discretion in finding Appellant's time on medical and suicide watch did not violate Article 13, UCMJ. Appellant was transferred to Bossier Max after being found unresponsive at the base confinement facility and then threatening and physically assaulting law enforcement personnel tasked with escorting him back to the base after a medical evaluation. Once at Bossier Max, Appellant made a number of suicidal gestures by trying to kill himself at least five times with such items as a laundry bag cord and a gown issued to him by the confinement facility. On one occasion, Appellant tried to swallow portions of his underwear, requiring jail personnel to forcibly intervene.

Although Appellant's confinement conditions while on medical and suicide watch were restrictive and invasive at times, we see no evidence of any intent to punish Appellant. Moreover, we agree with the military judge the conditions were not more rigorous than necessary to ensure Appellant's presence at trial, which necessarily included returning Appellant to the Air Force in a living state. Considering Appellant's repeated suicide attempts in conjunction with his combative conduct which led to his transfer to Bossier Max in the first place, we find the 17 days Appellant spent on medical and suicide watch to be both reasonable and justified by the circumstances. Therefore, we find no Article 13, UCMJ, violation, the military judge did not abuse his discretion, and Appellant is entitled to no additional credit for this portion of his pretrial confinement.

### 2. Conditions of Pretrial Confinement Not Raised at Trial

Appellant fully litigated his pretrial punishment motion at trial. On appeal, he seeks to supplement the record with information raised neither at trial nor in his clemency submission, such as his views regarding the cleanliness of his cell. Appellant has waived this issue, and, moreover, the Court of Appeals for the Armed Forces (CAAF) recently held an appellant may not supplement the record under the circumstances presented here. *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020)

As part of his PTA, Appellant agreed to "waive all waivable motions . . . with the exception of a motion for illegal pretrial punishment . . . which has been previously filed by [his] defense counsel." At trial, Appellant's pretrial-punishment motion only argued his placement in administrative segregation violated Article 13, UCMJ, and there was no mention of the conditions he now complains of on appeal. When "an appellant intentionally waives a known right at trial, it is extinguished and may not be raised on appeal." *United States v.*

*Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citations omitted). Motions brought under Article 13, UCMJ, may be waived as part of a PTA. *United States v. McFadyen*, 51 M.J. 289, 291 (C.A.A.F. 1999). Additionally, the "failure at trial to raise the issue of illegal pretrial punishment waives that issue for the purposes of appellate review absent plain error." *United States v. Inong*, 58 M.J. 460, 461 (C.A.A.F. 2003).

We conclude Appellant intentionally waived his right to raise additional complaints about his pretrial confinement in two ways. First, Appellant plainly understood the ability to raise Article 13, UCMJ, violations at trial by virtue of the fact he made a motion for relief under that provision discussing particular aspects of his incarceration. His election to not include in the motion the issues he now complains of is strong evidence of a conscious decision to not raise those issues at trial. Second, Appellant agreed in his PTA to waive motions, except for the motion for illegal pretrial punishment credit which had already been filed. By waiving motions other than the specific motion raised at trial, Appellant may not now on appeal seek an end run around that waiver by raising new factual bases for relief. We therefore conclude Appellant knowingly waived any error with respect to pretrial confinement conditions he did not raise at trial.

Without regard to Appellant's waiver of this issue, we do not have the authority to consider the factual assertions Appellant raises. In support of his appeal, Appellant filed an affidavit detailing new aspects of his pretrial confinement which he argues violate Article 13, UCMJ, and therefore warrant relief by way of sentence credit. Our superior court recently explained that we are only empowered to conduct our Article 66(c), UCMJ, 10 U.S.C. § 866(c), review "on the basis of the entire record." *Jessie*, 79 M.J. at 444–45. Only in certain limited circumstances may the record be supplemented during appellate review, such as when additional information is needed to resolve issues raised in the record or when an appellant is raising allegations regarding posttrial punishment. *Id.* Here, Appellant's affidavit consists of information that was known to Appellant at trial, yet was not raised until after action by the convening authority and for the first time on appeal. That is, the record is devoid of the matters Appellant now wishes to supplement the record with. Because this new information in Appellant's affidavit pertains to pretrial confinement and falls outside the record, we may not consider it, as our review is confined to that which is contained in the record. *Jessie*, 79 M.J. at 445.

### 3. Review of Appellant's Placement in Pretrial Confinement

The military judge declined to grant the Defense's request for an additional day of credit based upon Appellant's commander's failure to complete her pretrial confinement review within 72 hours as required under R.C.M. 305(h)(2)(A). The remedy for noncompliance with R.C.M. 305 provisions is one

day of credit "for each day of confinement served as a result of such noncompliance." R.C.M. 305(k). The military judge reasoned that that the phrase "confinement served as a result of such noncompliance" means credit is only available when an accused serves "additional or actual time as a result of non-compliance." Since Appellant was not released from confinement when the 72-hour review was completed, the military judge concluded Appellant did not spend any *additional* time in confinement as a result of the noncompliance, and he therefore gave Appellant no credit for the violation.

We review military judges' decisions whether to award credit for pretrial confinement violations for abuse of discretion. *United States v. Adcock*, 65 M.J. 18, 24 (C.A.A.F. 2007).

On appeal, the Government concedes Appellant's commander violated R.C.M. 305(h)(2)(A) by not timely completing her 72-hour review but argues Appellant would receive no benefit because any credit would be applied against the sentence adjudged, which was two years higher than the sentence approved. The Government cites *United States v. Rock* for this proposition. 52 M.J. 154, 156–57 (C.A.A.F. 1999). In *Rock*, our superior court ruled that confinement credit would be applied against the lower of the adjudged sentence or the approved sentence when the latter is limited by the terms of a PTA, at least with respect to restriction tantamount to confinement. The CAAF later clarified that all credits for violations of R.C.M. 305 are applied in the same way—that is, against "the approved sentence, *i.e.*, the lesser of the adjudged sentence or the sentence that may be approved under the pretrial agreement." *United States v. Spaustat*, 57 M.J. 256, 263–64 (C.A.A.F. 2002).

The military judge abused his discretion in concluding additional sentence credit is unwarranted for noncompliance with R.C.M. 305 when such noncompliance was not the cause of Appellant's confinement. The military judge's rationale for refusing to award additional credit would largely read the remedial structure of R.C.M. 305(k) out of the rule and provide no relief for violations whenever an accused remains in pretrial confinement past the violation.[7] A plain reading of R.C.M. 305(k) leads us to the conclusion that the credit provision is designed—in part, at least—to deter violations of the various requirements of R.C.M. 305, even when an accused might be confined without regard to any such violation. Notably, an accused who is confined in violation of the rule already receives credit for any time served in pretrial confinement. *See United States v. Allen*, 17 M.J. 126 (C.M.A. 1984). Thus, even an accused who is held solely because of a failure to follow R.C.M. 305's provisions, and who is

---

[7] Our sister court recently discussed their long-standing rejection of the rationale employed by the military judge. *See United States v. Harris*, No. 201600207, 2017 CCA LEXIS 547, at *7–9 (N.M. Ct. Crim. App. 15 Aug. 2017) (unpub. op.).

later released from pretrial confinement, receives credit for the time he or she spent confined. The Government offers no argument why such an accused should receive double credit for the time spent confined after the violation while an accused subjected to the same violation who is not released only receives credit at the one-for-one rate.

We also find instructive the lack of a requirement in case law that an accused show prejudice, such as being confined as a result of an R.C.M. 305 violation (as opposed to suffering an R.C.M. 305 violation which happens to occur during a period of confinement). For example, our superior court's predecessor in *United States v. McCants*, 39 M.J. 91, 93 (C.M.A. 1994), found credit warranted for an inappropriate delay between a pretrial confinement hearing and the reviewing officer's decision. In that case, the United States Court of Military Appeals granted the credit even though the reviewing officer's decision was to continue the appellant's confinement. *Id.* at 92–93.[8] We reached the same result when an accused's commander failed to complete his 72-hour review, yet the pretrial confinement reviewing officer determined the accused should remain in confinement. *United States v. Williams*, 29 M.J. 570, 572 (A.F.C.M.R. 1989). In another case, we determined a military judge violated an accused's Fifth Amendment due process rights as well as his right under R.C.M. 305(j) to a review of the propriety of his pretrial confinement when the military judge failed to timely rule on his motion for release. *United States v. Jemison*, 65 M.J. 872, 873–74 (A.F. Ct. Crim. App. 2007). There, we found credit was warranted without regard to the fact the military judge ultimately (and without error) ruled the accused should remain in pretrial confinement. *Id.*[9] Our sister courts have reached similar results. *See, e.g.*, *United States v. Moore*, 55 M.J. 772, 785–88 (N.M. Ct. Crim. App. 2001); *United States v. De Loatch*, 25 M.J. 718, 718–19 (A.C.M.R. 1987).

In this case, the Government concedes the error, which is that Appellant spent one day in confinement without a valid review of the commander's initial decision to place him in pretrial confinement. We perceive no logical reason for

---

[8] *See also United States v. Ballesteros*, 29 M.J. 14, 16 (C.M.A. 1989) (credit granted for delayed pretrial confinement hearing even when accused was continued in pretrial confinement once the hearing was held).

[9] However, *see United States v. Lavalla*, 24 M.J. 593, 595 (A.F.C.M.R. 1987), in which we concluded no additional credit was warranted where a military judge declined to consider an accused's motion for release from pretrial confinement, directing the accused instead to petition the pretrial confinement reviewing officer. In the unique facts of that case, the reviewing officer declined to release the accused, and the accused did not resubmit his motion to the military judge. *Id.* We consider our holding in *Lavalla* to be the product of its particular facts and note it was distinguished on its facts in *United States v. Jemison*, 65 M.J. 872, 874 (A.F. Ct. Crim. App. 2007).

distinguishing between accuseds who are subjected to R.C.M. 305 violations based upon whether they are later released from pretrial confinement or not, and we conclude that R.C.M. 305(k) credit, when warranted, is applied without regard to whether an accused is subsequently released. The delay in Appellant's case violated R.C.M. 305(h)(2)(A), and Appellant is entitled to one day of administrative credit under R.C.M. 305(k). Appellant raised this issue at trial, and the military judge abused his discretion in denying Appellant's request. Contrary to the Government's position on appeal, this credit is to be applied to Appellant's approved, not adjudged, sentence in order to give him meaningful relief.

## B. The Government's Case in Aggravation

At trial, KW both testified for the Government and submitted an unsworn victim impact statement under R.C.M. 1001A. Two noncommissioned officers, Appellant's section chief and first sergeant, were also called as Government witnesses to offer their opinions that Appellant had poor rehabilitative potential. Appellant argues the military judge erred in allowing the Government to introduce evidence in its case in aggravation in two ways: first, by allowing evidence suggesting that Appellant raped KW and, second, by allowing the rehabilitative potential testimony.

### 1. Evidence Pertaining to Appellant's Withdrawn Rape Charge

As noted above, Appellant was originally charged with raping KW. This charge, which was later withdrawn and dismissed, alleged Appellant committed the offense by placing KW in fear of death or grievous bodily harm. During KW's testimony, trial counsel sought to elicit details about the sexual intercourse KW and Appellant engaged in after Appellant brandished his knife. Trial defense counsel objected that the Government was "attempting to prove up rape." Overruling this objection, the military judge permitted KW to testify about what "appears to be a non-consensual sexual encounter" which "directly resulted" from Appellant's assault with the knife.[10] The military judge further explained that if KW was so afraid that she "felt coerced or compelled to consent to sex, or to give the appearance of consent sex that [she] did not intend to," such information would be evidence of the impact the assault with the knife had on KW. The military judge then noted he had performed an analysis under Mil. R. Evid. 403, finding the relevance of the evidence high and the danger of unfair prejudice low, especially in light of the fact Appellant was being tried by

---

[10] Appellant was originally charged with "pointing at [KW] a dangerous weapon with a means likely to produce death or grievous bodily harm." Appellant instead pleaded guilty to "brandishing a dangerous weapon," and he was ultimately acquitted of the originally charged language and convicted of the language to which he pleaded guilty.

military judge alone. He further explained on the record that Appellant's sentence may not be increased for any crimes he is not convicted of, and that he would not sentence Appellant "to a single day longer of confinement or of any punishment for a crime he's not been convicted of, that being the rape or nonconsensual sexual contact that I guess I'm about to hear testimony about."

We conclude the military judge did not abuse his discretion. Trial counsel is permitted to "present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). Such evidence includes that of psychological impacts on Appellant's victims, which KW's testimony plainly was. *See id.* Moreover, uncharged misconduct may qualify as aggravation evidence so long as that misconduct is directly related to an offense an accused is guilty of, which means the misconduct is "closely related in time, type, and/or often outcome, to the convicted crime." *United States v. Hardison*, 64 M.J. 279, 281–82 (C.A.A.F. 2007).

The CAAF considered a similar scenario in *United States v. Terlep* in which Staff Sergeant (SSgt) Terlep was originally charged with rape and burglary with the intent to commit rape. 57 M.J. 344, 345 (C.A.A.F. 2002). Ultimately, in accordance with a pretrial agreement, SSgt Terlep pleaded guilty to unlawful entry and assaulting the victim "with his hands." *Id.* During presentencing proceedings, the victim testified that she awoke to SSgt Terlep having sex with her and that SSgt Terlep later admitted to her that he had raped her. *Id.* at 347. The CAAF upheld the admission of the victim's testimony, pointing out that the rules covering military sentencing proceedings "provide for accuracy in the sentencing process by permitting the judge to fully appreciate the true plight of the victim in each case," and that SSgt Terlep's plea agreement did "not change the facts as to what happened to the victim that night in her view."[11] *Id.* at 350 (citations omitted).

In Appellant's case, KW's testimony was that she engaged in sexual intercourse with the Appellant for the purpose of de-escalating the situation Appellant had created by sneaking into the house, taking her phone, and threatening her with a knife—a weapon which remained within Appellant's reach. The Government's agreement to withdraw the rape charge is understandable, as there is no indication Appellant was trying to compel KW to engage in any

---

[11] Because SSgt Terlep's defense counsel did not object at trial, the military judge's admission of the evidence was reviewed for plain error. *United States v. Terlep*, 57 M.J. 344, 347 (C.A.A.F. 2002). In addition to finding no plain error, the CAAF also determined his defense counsel were not ineffective by not objecting to the evidence, indicating an objection—had one been made—would not have resulted in a different outcome. *Id.* at 349.

sexual conduct. By the same token, however, the fact KW felt that she needed to engage in sexual intercourse with Appellant in order to escape uninjured squarely reveals the degree of fear Appellant had placed her in by assaulting her with his knife. The sexual activity and the assault with the knife were not just in close temporal proximity to each other, they were part and parcel of an unbroken chain of events initiated by Appellant. Indeed, omitting KW's testimony about the scheme she employed to extricate herself from a volatile and dangerous situation would have provided the military judge with a diluted version of events robbed of its severity and urgency. The military judge did not abuse his discretion in admitting this evidence.

### 2. Rehabilitative Potential Testimony

Appellant argues his section chief, Master Sergeant (MSgt) MN, and his first sergeant, Senior Master Sergeant (SMSgt) CS, should not have been allowed to offer their opinions as to Appellant's poor rehabilitative potential. Appellant's argument is that trial counsel did not establish "proper foundation demonstrating that these witnesses possess the sufficient information and knowledge to offer an opinion regarding Appellant's rehabilitative potential." He further asserts the witnesses "rarely interacted" with him.

A witness offering an opinion about an accused's rehabilitative potential "must possess sufficient information and knowledge about the accused to offer a rationally-based opinion that is helpful to the sentencing authority." R.C.M. 1001(b)(5)(B). Such information and knowledge includes "the accused's character, performance of duty, moral fiber, determination to be rehabilitated, and nature and severity of the offense or offenses." *Id.* Opinions about an accused's rehabilitative potential are limited to whether the accused has such potential and "the magnitude or quality of any such potential." R.C.M. 1001(b)(5)(D).

Regarding MSgt MN's knowledge of Appellant, Appellant waived this issue. Claims of error with respect to the admission of evidence are preserved if a party both timely objects to the evidence and states the specific ground for the objection. Mil. R. Evid. 103(a)(1). When an appellant fails to make a timely objection to the admission of evidence at trial, that error is forfeited in the absence of plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)) (additional citation omitted). However, under the ordinary rules of waiver, when an appellant affirmatively states he has no objection to the admission of evidence, the issue is waived and his right to complain about its admission on appeal is waived. *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)).

When MSgt MN was being questioned by trial counsel, trial defense counsel objected to MSgt MN discussing specific instances of conduct unrelated to

Appellant's trial. While making this objection, trial defense counsel told the military judge, "We're not planning on objecting to a foundation for his opinion. The witness clearly knows [Appellant]." Trial defense counsel's position was well grounded, as MSgt MN had just testified he interacted with Appellant every day for more than a year and a half, ranging from simple greetings to counseling Appellant on his conduct "and everything in-between." By telling the military judge they did not plan to object on foundation grounds to MSgt MN's opinion, trial defense counsel did not simply fail to object to this testimony; instead, trial defense counsel had considered the possibility of objecting on foundation grounds and made the deliberate choice not to do so, thereby waiving this issue on appeal.

Our superior court cannot review waived issues, because affirmative waiver leaves no error to correct on appeal. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citation omitted). Pursuant to Article 66(c), UCMJ, the Courts of Criminal Appeals have the unique statutory responsibility to affirm only so much of the sentence that is correct and "should be approved." 10 U.S.C. § 866(c). Thus, we retain the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). We have considered whether to pierce Appellant's waiver of this issue, and we decline to do so in light of MSgt MN's familiarity with Appellant.

Appellant's first sergeant, SMSgt CS had less interaction with Appellant, but she testified that she would not only see him when she visited work centers, she also had one-on-one conversations with him about various personal problems he was experiencing including his sleep issues and anxiety concerns. SMSgt CS also had frequent contact with Appellant and KW due to a significant health problem suffered by their older daughter, and she went to Appellant's house at least once to check on him.

Trial defense counsel did not object to any part of SMSgt CS's short testimony, thereby forfeiting any error regarding this testimony absent plain error. We have carefully reviewed SMSgt CS's testimony, and we are convinced she demonstrated an adequate foundation to provide her opinion that Appellant's rehabilitative potential was "low." Thus, we do not find error, plain or otherwise, regarding her testimony.

## C. KW's Unsworn Statement

After the Government rested, KW provided a written unsworn statement for the military judge to consider. In that statement, KW discussed the fears she and her daughters continued to experience, writing, "When we are on base, we all get nervous when we see Security Forces with their weapons, and it took months to get [KW's younger daughter] to understand that they weren't going

to shoot her like daddy." Trial defense counsel objected to several portions of the unsworn statement, including this passage, noting "the [D]efense is not aware of any incident where any gun was fired." KW's Special Victims' Counsel posited that the reference was the product of the younger daughter having seen Appellant wave a gun around in her family's presence. The military judge overruled the objection and told the parties,

> I didn't hear any evidence of any shooting—I'm not going to consider any evidence of any shooting. To the extent that's just a miswording, and this is just to help me understand the impact [KW] has from observing her children are now afraid of weapons, and police officers who responded to her house and witnessed an aggravated assault with a firearm and witnessed police officers responding to an aggravated assault with a firearm in her home, I will consider it for that purpose.

As a victim of Appellant's offenses, KW was permitted to give an unsworn statement to the court about the impact Appellant's offenses had on her, to include any psychological impact. R.C.M. 1001A(c); R.C.M. 1001A(b)(2). This may include the psychological harm done to her daughters, whom KW is responsible for caring for, including helping them process Appellant's conduct. We have recently held that harm caused to a child can be vicariously transmitted to that child's parent such that the parent has been directly impacted and can discuss the harm in their own right, and we apply that rationale here. *See United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *25–26 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.).

There was no evidence in Appellant's case of him discharging a firearm, let alone shooting anyone. The military judge recognized this and placed the line in KW's unsworn statement in its proper context, that is, a three-year-old child trying to comprehend her father's abusive behavior towards her mother, including him waving a gun around in a threatening manner in the family's presence. To the extent the younger daughter concluded Appellant was going to shoot her and then transferred that belief to others she saw carrying firearms, and to the extent KW had to help the daughter mentally disconnect the two, this was victim impact information permissibly provided under R.C.M. 1001A. The military judge did not abuse his discretion in permitting KW to include this matter in her unsworn statement.

KW further wrote that her older daughter "tells her friends and teachers at school that her father is deployed or that he died in a car accident because she doesn't know how to tell them that daddy tried to hurt me. The pain and fear that [my daughters] feel and express is both heartbreaking and gutwrenching." This comment, which was not objected to, was likewise permissi-

ble under R.C.M. 1001A, as it amounts to KW explaining the impact Appellant's misconduct continued to have on her via her daughter being unable to understand how her father could have violently abused her mother. The psychological impact inflicted upon KW by seeing her daughter's reaction to Appellant's conduct is self-evident. We do not find plain error in the military judge's receipt of this information for his consideration in sentencing Appellant.

**D. Delay in Appellate Review**

Appellant's case was docketed with this court on 27 December 2018, and Appellant filed his initial assignments of error 244 days later on 28 August 2019 after requesting and receiving six enlargements of time over the Government's objection. The Government filed its answer on 27 September 2019, 30 days later.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

This case exceeded the 18-month standard between docketing and appellate decision by less than one month. With respect to exceeding the 18-month standard for producing this opinion, we note the record of trial is moderately long, including over 343 pages of transcript and 34 appellate exhibits. In addition, Appellant took nearly eight months to file his assignments of error after requesting six enlargements of time. We are affirming the findings and sentence in Appellant's case, and Appellant remains in confinement.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Appellant has not demonstrated any oppressive incarceration, and

his appeal resulted only in a nominal reduction in his sentence. He has not alleged any particularized anxiety or concern. Since we are not returning his case for a rehearing, his ability to present a defense at such a rehearing is not impacted. Finding no qualifying prejudice from the delay, we also conclude there is no due process violation, as the delay is not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

Appellant will be credited with one day against his approved sentence to confinement. The approved findings and the sentence are correct in law and fact, and no further error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court